KATHLEEN CITRUS LAND COMPANY v. CITY OF LAKELAND, GEORGE W. MERSHON, as Mayor-Commissioner; H. CLAY HAYNES and LUTIE N. KOON, as Commissioners; J. L. DAVIS, as City Comptroller; W. F. REED, as City Treasurer, and J. L. DAVIS, as City Clerk.

169 So. 356.
Opinion Filed June 13, 1936.
Rehearing Denied July 21, 1936.

660

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

*Wm. K. Love,* for Appellant;

*Carver & Langston,* for Appellee;

*Peter O. Knight, Francis P. Fleming, Allen Clements, Jim Clements, J. A. Franklin, Fred R. Wilson, Murray Sams, E. Noble Calhoun, Sumter Leitner, Ernest E. Mason, Ralph A. Marsicano, W. G. Vaughn, Leon J. C. Harton, J. M. Austin, J. W. Watson, Jr., Wm. M. Madison, Russell*

*Snow, E. O. Denison, Thomas W. Butler, R. A. McGeachy, W. L. Long, W. H. Nollman,* as *Amici Curiae.*

ELLIS, P. J.—This is an appeal from an order dismissing a bill of complaint exhibited in the Circuit Court for Polk County by Kathleeen Citrus Land Company, a Florida corporation, doing business in Lakeland, Florida, the record owner in fee simple of lands in the City of Lakeland and a taxpayer of *ad valorem* taxes levied and assessed by the city thereon, against the city, the mayor, commissioners, city comptroller, city treasurer and city clerk, the name of each such officer being given in full.

The purpose of the bill is to restrain temporarily and permanently the city and its named officials from issuing "Sewer Revenue Debentures" under the provisions of an ordinance theretofore adopted by the City Commissioners, and hereinafter more particularly described, and from issuing such debentures under the provisions of Chapter 17118; Laws of Florida, 1933, without the approval of the proposed debt by the freeholders of the city in accordance with the provisions of Section 6 of Article IX of the Constitution of Florida.

The order from which the appeal was taken was made upon a motion by the defendants to dismiss the bill. The motion admits the allegations of the bill well pleaded. The Chancery Act (Ann.) McCarthy, p. 81, Sec. 33 and annotations; City of Jacksonville v. Shaffer, 107 Fla. 363, 144 South. Rep. 892; Yates v. St. Johns Beach Dev. Co., 118 Fla. 788, 160 South. Rep. 197.

As no answer was filed in this case the court on motion to dismiss will consider only the facts alleged in the bill; but nothing *dehors the. bill.* Chancery Act, *supra,* p. 82 note.

If, therefore, the bill states any ground of equitable relief

the motion should have been denied. See authorities cited above.

The complainant is a corporation, but it is a person in law and a resident and citizen of the City of Lakeland within the meaning of laws defining the jurisdiction of courts or otherwise relating to citizens if the purpose of the law renders it applicable. See 14 C. J. 66, 67.

This Court has held that a citizen taxpayer may have a right to maintain a suit to enjoin the execution of illegal contracts involving payments from a public fund to which the citizen taxpayer is a contributor. See Hathaway v. Munroe, 97 Fla. 28, 119 South. Rep. 149.

This Court has also announced the doctrine that when authority to bring a suit to suppress a nuisance is properly conferred upon a private citizen the suit is in effect one instituted in behalf of the public and in which the public is the real complainant to the same extent as though the suit were brought by the Attorney General, language of Mr. Justice STRUM in the case of Pompano Horse Club v. State, 93 Fla. 415, 111 South. Rep. 801.

It is difficult to conceive of a more reprehensible dereliction of official duty than the affirmative act of misappropriating funds or the exercise of arbitrary power in the matter of taxation contrary to constitutional or statutory inhibitions. Such conduct is a renunciation of official obligation, the usurpation of authority. Taxation is an attribute of sovereignty and requires the consent of the governed through duly accredited representatives. It can be exercised only pursuant to a valid statute containing definite limitations. A tax is not a debt in the ordinary sense. It is not predicated on contract. It is a burden imposed by the sovereign power through duly accredited representatives for the support of the government. It is inherent in the sovereign power and may be exercised even to the point

of destroying the commercial or use value of the thing on which it is laid. See Reynolds v. F. C. & P. Ry. Co., 42 Fla. 387, 28 South. Rep. 861, affirmed in 183 U. S. 471, 46 L. Ed. 283, 22 Sup. Ct. Rep. 176; A. C. L. R. R. Co. v. Lakeland, 94 Fla. 347, 115 South. Rep. 669; Flood v. Homeland Co., 95 Fla. 1003, 117 South. Rep. 385; St. Lucie Estates, Inc., v. Ashley, 105 Fla. 534, 141 South. Rep. 738; Van Deman & Lewis Co. v. Rast, 214 Fed. Rep. 827; 61 C. J. 76; 26 R. C. L. 26.

A burden directly or indirectly imposed upon persons or property for the support of governmental activities is an exercise of the taxing power. 61 C. J. 58; 26 R. C. L. 13, 267; and authorities cited in the notes; Union Bank v. Hill, 3 Coldw. (Tenn.) 325, 327, Columbia Gas Light Co. v. Mobley, 139 S. C. 107, 137 S. E. Rep. 211.

The power to levy a tax, therefore, is one of the essential attributes of sovereignty and is inherent in and necessary to the existence of every government. M'Culloch v. Maryland, 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579.

It follows, therefore, from the nature and quality of the sovereign power of taxation that it should be exercised carefully, wisely and clearly within the limitation of the power which may be vested in a governmental agency.

The City of Lakeland, which was organized under the laws of Florida, particularly Chapter 10754, Acts of 1925, undertook through its duly constituted officers acting as they supposed under the provisions of Chapter 17118, Laws of Florida, 1935, to enact an ordinance by its City Commission proposing the construction of a sewerage system as an extension to the sanitary sewerage system which was then owned and operated by the city. The ordinance was adopted in March, 1936, and provides for the construction of the sewerage system extension at an estimated cost of $176,365.00, which it was proposed to secure by the issuing

of "Sewerage Revenue Debentures" in the sum of $115,-000.00 maturing serially from 1937 to 1967, inclusive, that sum to be supplemented by a proposed grant of public money from the United States Government. It was proposed that the debentures should be paid only from a sinking fund in which there should be set aside in approximately equal monthly installments out of the revenues and income derived from the operation of the sanitary sewerage system as so extended, after the provision for the payment of all operating costs, such sums as should be sufficient for the payment of the interest on and principal of the debentures as the same should respectively become due.

Under the provisions of the ordinance the payment of the debentures and the accruing interest thereon are to be secured by a pledge of an exclusive first lien upon all revenues set aside in the sinking fund and not to be payable from nor to be a charge upon any funds other than the revenues so pledged to the payment of the debentures. The ordinance provides that no tax liability should be imposed "upon any real or personal property in the City of Lakeland," nor should the obligation "constitute a debt" against the city. The ordinance declares the "project" to be expedient and necessary in the interest of "public health and welfare": that the "project" would cover an area not now served by a similar convenience. The amount to become due on the debentures by way of principal or interest which latter should be evidenced by coupons should be payable at the Treasurer's office in Lakeland or at a place in New York at the option of the holder of the debenture or coupon.

A form of the proposed debenture is set out in the ordinance and contains a promise on the part of the city to pay the bearer or registered owner of the debenture the amount stated in the obligation "solely from the sinking fund provided therefor" and not otherwise.

The proposed written obligation recites that the requirements of the Constitution and statutes of the State of Flordia have been complied with as well as those of the ordinance in the matter of issuing the obligation.

The "debentures" are to be signed in the name of the city under its official seal. Lengthy provisions are recited in the ordinance for the keeping of books, the registration of the "debentures," the signing and complete execution of the evidences of debt and the creation of a sinking fund from the operation of the Sanitary Sewerage System of the city. It is provided that from the proceeds of the sale of the "debentures" a deposit is to be made in the sinking fund of an amount representing the accrued interest to the date of sale and amount of interest which shall become due during the period of the construction of the "project." The ordinance provides how the "project" is to be operated. "Reasonable rates" for the use of or in connection with the Sewerage System are to be charged. The city, or any department, agency or instrumentality thereof may use the system for which the city will be charged "the reasonable value of the facilities or services."

In case of default in the payment of principal or interest on any "debentures" the holders of twenty per centum in principal of the amount outstanding "shall be entitled as a strict matter, of right to the appointment of a receiver" who may take possession of the System, operate and maintain it, prescribe rates and apply the proceeds in the same manner as the city may do. A like procedure may be followed upon another default in the payment of interest and principal after the System has been restored to the city by the first receiver.

The ordinance is very complete in all details and may be succinctly stated to outline a plan for the enlargement of the sewerage system of the city in which the outstanding

features are as follows: (a) The extension of an existing sewerage system into an area of the city not served by the existing system; (b) The estimated cost of the construction of the extension will be $176,365.00 of which amount about $61,365.00 to be contributed by the United States Government, and $115,000.00 to be raised by the city from its written promises to pay with four per cent. interest distributed over a period of thirty years; (c) A charge for the use of the system as a whole will be made against each person or property owner using the same; (d) The city and each of its departments or agencies using the system is to be charged a reasonable sum for such use; (e) No maximum limit is prescribed for use of the system by individuals or by the city; (f) From the income derived from the use of the entire system a "Sewer Revenue Fund" is to be established into which all the income from the Sytem's use is to be paid; (g) That fund is to be divided into two accounts, one a "Sewer Operation and Maintenance Account" and a "Sewer Sinking Fund"; (h) The "Debentures" and interest thereon are to be paid from the "Sinking Fund" account on which a lien is placed for such payment; (i) The "Debentures" nor the ordinance authorizing the construction of the "Project" is intended to create any encumbrance, mortgage or other pledge of or charge upon any property or funds of the city or to impose any tax liability upon any real or personal property in the city or to "constitute a debt against the city."

Section 6, as amended, of Article IX of the Constitution is as follows: "The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, and the Counties, Districts or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election

in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law; but the provisions of this Act shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such Counties, Districts, or Municipalities."

It may be well preliminarily to have a clear understanding of the meaning of this constitutional provision before applying it to the conditions described in the bill of complaint in this case. The word "bonds" is used four times in this section. Its first use appears in the clause limiting the power of the Legislature in the matter of issuing "State bonds."

In that connection the word was used in the Constitution of 1885 before the amendment. It was used also in the Constitution of 1868, Sec. 7, Art. XII. The language used was as follows:

"The Legislature shall have power to provide for issuing State bonds bearing interest for securing the debt of the State, for the erection of State buildings, and for the support of State institutions; but the credit of the State shall not be pledged or loaned to any individual, company, corporation or association," etc. See Const. 1868.

In 1885 the Constitution narrowed the purpose for which bonds might be issued to "repelling invasion or suppressing insurrection or for the purpose of redeeming or refunding bonds already issued." The inhibition against pledging the credit of the State to any individual, company, corporation or association was retained in a different section. See Sec. 10, Art. IX, Const. 1885.

The words "State bonds" as they appeared in the Constitution of 1868 were construed or interpreted by the Supreme Court of Florida in the case of Cheney and Wife v.

Jones, 14 Fla. 587, in which it said: "What is a State bond but a *promise* to pay the principal and interest of its debts, equally binding upon us, whether it be in the form of a bond or an open indebtedness?"

In the same case the Court directed attention to the fact that a bond does not create a debt, but is simply a means of securing the future payment of principal and interest and the Legislature under that Constitution could authorize the issue of bonds (written promises) for that purpose whenever a debt had been incurred. It was also pointed out that the Legislature had the power only to provide for the issuing of bonds for "securing" the debts of the State. The Court held the Act of 1871 (Chap. 1833) to be valid insofar as it authorized the issuing of bonds to secure any indebtedness which had accrued up to the time of the passage of the Act but invalid insofar as it authorized the issue of bonds at a future time in exchange for any indebtedness not yet incurred and growing out of the ordinary expenses of the State.

It is apparent that the word "bonds" as used in the Constitution of 1868 and as interpreted by this Court in the year 1874 had relation to "debts" which might have been created under the authority of law to pay which taxes might have been levied or "bonds" issued to secure the debts and taxes levied to pay the principal and interest thereof.

The incurring of "debts" was the principal subject which gave the true significance to the word "bonds" which the Court said were mere promises to pay a debt. The power involved was the sovereign power of taxation. That was the power which was guarded by the constitutional limitation. That power could only be exercised to provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the prin-

cipal and interest of the "existing indebtedness of the State." Sec. 2, Art. XII, Const. 1868.

That clause was construed to be ambulatory, that is to say, it applied to the indebtedness which might exist any time after the adoption of the Constitution by reason of some occurrences in one or more years when the tax levied for State expenses was not sufficient to pay the debt incurred for such expense and to meet which a tax might have been lawfully levied and collected. Therefore to pay such indebtedness lawfully incurred as a State expense and for which a tax might have been laid, a "bond" or promise to pay such indebtedness might lawfully be authorized by statute to be issued to secure the payment of the indebtedness and a tax levied to pay the principal and interest of such "bonds" or a tax might have been levied to pay the debt due.

The word "bonds" was thus interpreted to have relation only to "debts" existing and it was further narrowed in its meaning by the character of "debts" existing which must have been such as were incurred for State expenses to defray which revenue might have been lawfully raised. In different words, such debts for State expenses as a tax might have been lawfully levied and collected to meet and pay "bonds" as thus used in the Constitution of 1868 was a mere name for a "promise to pay" a debt incurred for State expenses to defray which a tax might have been lawfully levied. It was a mere means by which the "debt" was spread over a term of years thus lessening the burden which rested on the people. The word had relation only to a debt already in existence lawfully created as a State expense and not to a debt to be created in the future.

In an advisory opinion to the Governor in November, 1927, see 94 Fla. 967, 114 South. Rep. 850, the Justices of

this Court placed that interpretation upon Sec. 6, Art. IX of the Constitution of 1885, by stating that the Constitutions of 1868 and 1885 relating to the matter of issuing "bonds" have the same meaning. After holding that a lawful expense incurred by the State Road Department, an agency of the State, was a legitimate State expense the Justices said: "The Constitution does not contemplate that State revenues *may* be *anticipated* or *supplemented* by money borrowed upon *promises* to pay in the future made for the State by a State agency." (Italics supplied.)

Now the Constitution of 1885 modified the provisions of the Constitution of 1868 in the matter of issuing bonds by the State as hereinbefore pointed out. The power of the Legislature to provide for issuing State bonds was materially narrowed by eliminating certain purposes for which State bonds could have been provided under the Constitution of 1868, such as securing the debts of the State, the erection of State buildings and the support of State institutions. The Constitution limited the power to provide for issuing State bonds *"only* for the purpose of repelling invasion or suppressing insurrection, or for the purpose of redeeming or refunding bonds already issued, at a lower rate of interest." (Italics supplied.)

The reason for that action of the people is most obvious to the student of Florida history. Following the adoption of the Constitution of 1868 the State passed through a long period of incompetency in the legislative department and wasteful even reckless extravagance in the enactment and administration of the laws, threatening the "profligate increase of the public burdens" by expending more than the revenue justified and putting afloat promises to pay the same. So therefore to prevent the "depreciation of (the State's) credit by hawking it about at a large discount for the sake of temporary relief, almost sure to result in fu-

ture disaster," a further limitation was placed on the power to incur debts and issue promises to pay them. Cheney v. Jones, *supra*.

Those words of Mr. Chief Justice RANDALL and the thought expressed by them apparently moved the framers of the Constitution of 1885 to place a further limitation upon the legislative power in the matter of incurring debts and issuing promises to pay them.

For nearly forty-four years the Legislature observed the limitations imposed, but the pressure of the demands incident to the State's growth, the necessity for the construction of good roads, the development of swamp lands by drainage operations, the growth of the demand for better school facilities, the improvement of municipal facilities and the apparent need for other public works in cities and towns incident to the growth of the idea of public ownership of water and electric light and power plants and sewerage systems, were met by the expedient of empowering State agencies and political subdivisions such as counties, drainage, road and school districts and municipalities to incur indebtedness for such public works and issue "bonds" or promises to pay therefor by spreading the burden over a long period of years and to levy taxes to pay the same.

The practice of incurring indebtedness by such agencies increased in intensity and general exercise until the "debts" and face value of the "bonds" issued to pay the same approximated if it did not exceed, the total assessed value as shown by the tax rolls of all the real estate in Florida.

Then came the collapse of the real estate boom, so-called. Real estate values decreased materially; many banks were forced into liquidation. The people lost millions of dollars in disappearing bank balances and shrinkage of real estate values until the burden of debt seemed to be impossible to

carry and the credit of the State through the default of its agencies seemed to be imperiled.

In that situation the Legislature of 1929 submitted for consideration to the people a proposed amendment to Section 6 of Art. IX of the Constitution, by which "Counties, Districts or Municipalities" were permitted to "issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts or Municipalities shall participate." The one exception was in case "bonds should be issued exclusively for the purpose of refunding of the bonds or the interest thereon of such Counties, Districts or Municipalities." That proposition was adopted by the people at the general election of 1930 and became a part of the Constitution.

It seemed to be a ratification of the practice of such agencies under legislative Acts which had resulted in such a burden of debt upon the people. Whether it may be so interpreted or not, the purpose of the people to stop such an orgy of spending and debt incurring was plain in the adoption of the amendment and the thought was evident that in the matter of the incurring of indebtedness by the different State agencies named and the issuing of promises to pay the same could be more safely intrusted to the vote of the freeholders of the respective agencies than to the persons officiating as officers of such agencies under broad legislative authorization.

Whether the proposition of Lakeland as set forth in the bill of complaint lies within the inhibitions of the Constitution as the same have been explained does not depend upon whether the proposed promises to be issued by the city are "bonds" within a narrow meaning of the term having relation to form and name and verbal construction, but

whether the "project" contemplates the incurring of an indebtedness by the municipality in whole or in part, directly or incidentally, presently or potentially coercive upon the municipality to exercise the sovereign power of taxation to redeem such promises or pay any portion of such debt or expense incident to the execution and maintenance of the project. That must be so because the power of debt making and taxation to pay it or any part of it cannot be gauged by the degree or extent of its exercise. The municipality must confine its expenses within its legitimate revenue for the fiscal year whether for governmental or proprietary activities, where such activities may entail present funding of future revenue derived from the exercise of the taxing power "whether general or limited, direct or contingent in form." See Leon County v. State, 122 Fla. 505, 165 South. Rep. 666.

The construction of a new electric, gas or water works plant and a sewerage system is a municipal function and when the properties are acquired the plants or systems constructed may be said to be held in a proprietary capacity, but before such completion the taxing power of the city may be exercised to establish such utilities and when once established and become in general use by the people for their convenience, health and peace there occurs a transition in the nature of the city's duty to continue the service which the utilities afford, because their discontinuance may produce general impairment of peace and health conditions.

An electric light and power plant once established and in general use becomes from the viewpoint of convenience and public peace essential and imposes on the city a coercive moral if not indeed a governmental duty to maintain it. No one can reasonably maintain that the maintenance of a water system when once established and in general use may be abandoned and the water supply of the people shut off

merely because the income from the users is not sufficient to maintain the system and continue the service. The exercise of the power of taxation could no more reasonably be denied to the city to provide the necessary revenue to continue the service than it could be denied in the first instance to establish the plant. In the case of a sewerage plant in connection with which water must be used the reason for its maintenance and operation becomes a self-evident governmental function.

In either case, however, when a debt is to be incurred for the purpose of construction or maintenance and continuance of operation, the question of whether the debt shall be incurred and anticipated tax revenues pledged to secure it, the Constitution, Sec. 6, Art. IX, requires a decision by the freeholders of the city in the manner prescribed.

Contingent liabilities to the city in the construction and operation of the so-called proprietary properties exist, and such liabilities are often reduced to definite obligations which may be discharged by revenues from taxation. Indeed a mandamus will lie in a proper case to compel a city to levy a tax to pay such judgment debts. 44 C. J. 1492; 38 C. J. 779.

In the case of Boykin v. Town of River Junction, 121 Fla. 902, 164 South. Rep. 558, in an able opinion by Mr. Justice Davis, this Court held that where a municipality desired to construct improvements and additions to its water supply system with the proceeds of the sale of mortgage revenue certificates to be paid or redeemed from the joint revenue of the entire system whose physical properties are pledged to secure the payment of such certificates accompanied by an obligation by the municipality itself to pay for all water and sewerage service required from the utilities as combined, the money thereof being paid into the combined utility accounts which to the extent of any excess

in operating expenses accruing thereto are pledged and obligated to secure the payment of the certificates, such scheme of financing adopted in accordance with the provisions of Chapter 17118, Acts of 1935, Laws of Florida, is "violative of amended Section 6 of Article IX of the Constitution of Florida unless and until same shall first be sub-· mitted to and duly approved by a majority of the votes cast in an election duly called and held" in such municipality in which a majority of the freeholders who are qualified electors in such municipality participate.

The reason lying behind the holding of the Court is that such a scheme of financing creates a conditional indebtedness on the municipality's part in the nature of a legal liability for a capital venture predicated upon the municipality's ordinary municipal credit and *"constitutes an interest bearing assumption* of liability for the repayment of the money so borrowed that *must* be ultimately discharged by taxation of the municipality mortgagor is not to lose its property in the utility whose physical properties, accom-· panied by a special municipal franchise (property) right, has thus been obligated." (Italics supplied.)

In substance the two schemes of municipal financing developed by the Town of River Junction and the City of Lakeland are identical. ·The one feature in the scheme of the Town of River Junction which it is claimed differentiates it from the Lakeland scheme is the mortgage lien and contingent franchise to be granted to the purchaser to operate the system in the event of a sale under the foreclosure of the lien.

That feature, however, constitutes no controlling factor in the moral or governmental coercive necessity under which the municipality would be brought by abandonment of the system because of inadequate revenues from it in one case, or the loss to a private purchaser at foreclosure sale in the

other. In each case the municipality would be under the necessity, coercive in character, from either a moral or governmental obligation to exercise the taxing power to save its properties and continue its public service in an enterprise essential to the peace, health and convenience of the people served by the utility.

Indeed the coercive character of such a situation in the Lakeland case is far greater than such a situation would be in the Town of River Junction, because in the latter there is the alternative of a private operation of the system in case of the loss of it by the city while in the Lakeland case the alternative is abandonment entailing incalculable discomfort and injury to the people, if the power of taxation is not exercised to make possible the continuance of the service. Chapter 17118, Acts 1935, *supra,* however, provides in Section 5 that the certificates are mortgage revenue certificates or debentures and although they impose no tax liability upon any real or personal property in such municipality nor constitute a debt against the municipality's issuing the same, they constitute a "lien only against or upon the property and revenues of such utility, including a franchise setting forth the terms upon which, in the event of foreclosure, the purchaser may operate the same."

If that statutory provision is as effective as a contract provision to the same purpose in the certificates then the situation in case of default in the payment by Lakeland of her certificates would be identical with that of the Town of River Junction in like case, but it is shown that such feature of the certificate's obligation is not the controlling factor in the coercive necessity under which the city would be brought in case of default.

If it is urged that in the case of the City of Lakeland where a foreclosure of the lien is undertaken by the certificate holders, only a Receiver would be permitted to them

to operate the system, the Receiver would be forced to levy a toll for the use of the system so heavy that the charge for the service would be so burdensome that the city would be coerced by the necessities of the situation to use its taxing power to relieve the people from the oppressive burden. See Brash v. State Tuberculosis Board, 124 Fla. 167, 167 South. Rep. 827.

In the case of State v. City of Daytona Beach, 118 Fla. 29, 158 South. Rep. 300, where the city obtained a loan from the United States Government with which to construct certain additions and improvements to its water supply system the court held the certificates valid on the theory that the city charter empowered the city in its proprietary capacity to establish and maintain a municipal water works, which was legally sufficient to enable the city in that special capacity to anticipate its water revenue collections in order to raise the funds needed to provide for essential additions and facilities to enable the system to serve the purpose for which it should be maintained. That power it was lawful, the Court said, for the city to exercise, so long as it does not without particular authorization undertake to "mortgage, pledge, or obligate the plant itself, or obligate the taxing power or revenues of the city derived from other sources." The cases of State v. City of Miami, 113 Fla. 280, 152 South. Rep. 6; State v. City of Lake City, 116 Fla. 10, 156 South. Rep. 924, were cited as controlling as to the attack made on the certificates in the case.

In the Daytona Beach case, *supra,* the possibility of an indirect or contingent coercive necessity arising out of the situation where because of failure of revenues from the system itself abandonment or loss of it should become inevitable unless the city should exercise its taxing power to enable it to discharge the governmental duty of preserving the property and system by a tax to supplement the sys-

tem's revenues and thus retain the property to the preservation of the peace and health of the community, was not involved.

In different words, the entirely practical and perfectly legal transition of the municipal power and duty relating to such public utilities from a proprietary management to a governmental function necessary to be exercised in given situations to preserve the peace, health and convenience of the people in the protection of the domestic and commercial necessity which such utilities create was not considered.

The Miami case mentioned in this opinion involved the sole proposition that a municipality owning in a corporate or proprietary capacity a water supply system under special legislative authority to do so, from which system the city derives annual revenues which it is empowered to expend as and when received by it for repairing, extending, enlarging and improving the water system may pledge such revenue by issuing certificates binding *solely* and *only* on such water revenues and not *"constituting a direct, indirect* nor *contingent* pledge or obligation" of the taxing power but affirmatively negativing any and all legal obligation on the part of the city for the payment of the same as an indebtedness against *anything except* the *special fund* to be made up of the revenues pledged if when and as realized and available for that purpose.

The Court decided that proposition in the affirmative and the decision marks the limit of the Court's sanction under Section 6 of Article IX of the Constitution of efforts on the part of municipal officers to exceed the limit of the city's statutory borrowing capacity by circuitous and evasive methods of complex finance scheming supported by subtleties and refinements of reasoning to show that no debt or liability is imposed upon the city by such methods of borrowing.

The Court was careful, however, in the Miami case to clearly point out features which the borrowing plan must contain to be legal; the anticipated revenues from the system of water works only and solely should be pledged and the contractual terms of the certificates must *affirmatively* negative any and all legal *obligation* on the part of the city for the payment of the same as an *indebtedness* against anything except the special funds if, when, and as *realized* and *available* for that purpose.

Any scheme which may involve or be interpreted as constituting a direct, indirect or contingent pledge or obligation of the city's taxing power will bring it within the constitutional inhibition of creating the indebtedness without the consent of the freeholders in an election called to determine the question.

In the case of the State v. City of Miami, *supra,* the learned Justice who prepared the opinion, Mr. Chief Justice DAVIS, discussed three groups of cases from different jurisdictions relating to municipal borrowing under constitutional provisions similar to ours and statutory debt limitations. It was not definitely stated which group of authorities the Court would follow, but it was indicated that the so-called Illinois doctrine was more nearly in line with what the Court conceived to be the correct interpretation of our Constitution, which it was stated forbade the creation of an obligation without a vote of the freeholders which would directly, indirectly or contingently involve the taxing power.

And in the case of Boykin v. Town of River Junction, *supra,* this Court declared in favor of the view held by one of the group of cases collected and discussed in the Miami case, which holds to the doctrine that: "to permit a public corporation to borrow any money under a contractual device of its repayment with interest, even though it is expressly

provided therein that the municipality will not be liable generally for its repayment, but that the lender shall look solely to pledged municipal property or assets, or the income thereof, as security, in effect annuls an intended constitutional debt creation restriction" similar to ours.

If public officials think that they are hampered by restrictions upon the taxing power which interferes with their plans for the public good, the remedy is not to be found in destroying the limitations of the Constitution. Where the people in their Constitution expressly place a limit upon public servants in the exercise of the taxing power, any scheme of financing which may involve an even doubtful transgression of such limitation should be resolved against the public officials and in favor of the people, which is the surest method of preserving to them the rights which they have not surrendered into the hands of their servants.

The Illinois view is that taxpayers are interested in all funds of the city regardless of the source from which they come; whether from taxes, licenses or tolls for public utility services paid by individuals. So that when the "entire proceeds of the existing water works system were pledged to secure payment of the certificates" they created a debt against the city.

The Court in the case of Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. Rep. 462, 14 L. R. A. (N. S.) 874, held, however, that a city may acquire a system of water works by pledging the income until it shall pay for the system and no indebtedness would be created. The same doctrine, said the Court, might apply to some definite extension of water works where the income of the extension could be separated and applied to payment, "but an obligation to pay with the income of property already owned by a city is not different from an obligation to pay with any other

funds, so far as the question whether the transaction amounts to a debt is concerned."

This doctrine was approved in the case of Boykin v. Town of River Junction, *supra,* with the single distinction that marked the Miami case, *supra.*

We do not follow the Illinois doctrine, however, as to the acquisition of a new plant and do not hold that the pledging of revenue from the new plant so acquired does not create an indirect or contingent liability because the plant once established and become in general use a coercive situation arises to require the exercise of taxation to preserve the plant to the use of the inhabitants and citizens to the end that the peace, convenience and general welfare of the community may be preserved.

The opinion in the case indicated the view of the Court to be that such scheme of municipal financing which may be deemed to lie without the area of the constitutional inhibition against incurring municipal indebtedness without the approval of the freeholders of the city where voters must affirmatively appear to bind only and solely the *revenues* derived or anticipated from an *independent revenue producing* utility, and the evidences of indebtedness issued must affirmatively negative any obligation as an indebtedness direct, indirect, or contingent against *anything* except the special fund. The doctrine announced in that case was also limited to a revenue producing plant *in use* and was not stated to be applicable to obligations for extensions and additions when made payable from the gross income of the enlarged plant.

The Court definitely declared that it would "adhere to the rule of constitutional law which regards the substance rather than the form of things."

We think that the word "bonds" as used in the Constitution in the section and article mentioned is inseparably

interwoven and amalgamated with the idea of taxes, indebtedness and liability which may directly, indirectly or contingently place an obligation upon the municipality to discharge by the exercise of its governmental power of taxing the property or people of the community. The Constitution inhibited all and any sort of debt direct, indirect or contingent which at any time may require the exercise of the taxing power to relieve, or which may as conditions arise in relation to the operation and maintenance of the utility plants indirectly coerce the city through a sense of either moral or legal obligation to exert its governmental authority by taxation to raise a fund to save to the city the corporate property and continue its operation in the interest of the peace, health and convenience of the people.

Chapter 17118, *supra,* in attempting to create a lien upon the water or sewerage plant and providing for its being taken over and, operated by private owners under a franchise adopted to that end violates the constitutional inhibition mentioned as explained by this Court in the able opinion of Mr. Justice DAVIS.

The order appealed from is reversed with directions to grant the injunction sought unless and until the certificates proposed have been approved under the provisions of amended Sec. 6 of Article IX of the Constitution.

Reversed.

WHITFIELD, C. J., and TERRELL, BUFORD and DAVIS, J. J., concur.

BROWN, J., dissents.