**GOLDEN v. GRAY, Secretary of State.**

Circuit Court, Leon County.

May 28, 1956.

Reversed by the Supreme Court, September 7, 1956.

Leonard Pepper, Tallahassee, for plaintiff.

Richard W. Ervin, Attorney General, Howard S. Bailey, Assistant Attorney General, Tallahassee, for the Secretary of State.

Anderson & Nadeau and Edward L. Semple, all of Miami, for Metropolitan Charter Board and Dade County League of Municipalities, intervenors.

HUGH M. TAYLOR, Circuit Judge.

This cause was heard by the court on plaintiff's bill of complaint and motions of the defendant and of the intervenor Metropolitan Charter Board for summary final decree.

Plaintiff as a citizen and taxpayer challenges the validity of Senate Joint Resolution No. 1046, a proposed constitutional amendment, seeks a declaration by this court of the rights and status of the parties herein in relation thereto, and an order restraining the defendant Secretary of State from publishing and causing the proposed amendment to be placed on the ballots to be voted on in the 1956 November election.

Senate Joint Resolution No. 1046 was adopted by each house of the legislature of 1955 as a proposed amendment to the constitution of Florida. It provides for the creation by the legislature of a Metropolitan Charter Board whose duty will be to prepare a proposed "home rule charter for Dade County, Florida," which is to become effective when approved by a majority of the qualified electors of Dade County. The nature of the proposed charter and the "home rule" to be exercised thereunder is outlined in generalities in the proposed amendment and will be referred to in some detail hereafter.

The sole question presented for decision in this case is whether or not Senate Joint Resolution No. 1046 is a valid proposal of an amendment to the constitution. There is no contention that the contents of the proposed amendment in any way violate the constitution of the United States; nor is it contended that the resolution was not adopted by the legislature in accordance with the mechanical requirements of the constitution of Florida.

The plaintiff's contention is that the contents of the proposed amendment exceed the powers of the legislature to propose an amendment to the constitution as stated in section 1, article XVII of the constitution. Only questions of law are presented and it is proper to determine the rights of the parties upon a motion for summary decree.

At no time is the duty of the court more delicate or its responsibility greater than when it is called upon to determine whether or not a proposal of a change in the constitution which has received the affirmative vote of three-fifths of the members of each house of the legislature may properly be voted upon by the people of the state.

On the one hand the court must remember that—"All political power is inherent in the people. Government is instituted for the protection, security and benefit of the citizens, and they have the right to alter or amend the same whenever the public good may require it." Bill of Rights, sec. 2. The highest duty of the court is to protect this right of the people.

On the other hand the constitution specifies the method by which it may be revised or amended. Article XVII. These methods of change in the organic law are a vital and essential part of our system of government. For the courts to approve efforts to make changes in the constitution by means other than those specified in the constitution would be as dangerous as preventing changes being made in a proper and orderly way.

The applicable parts of article XVII are as follows—

Section 1. *Method of amending constitution.*—Either branch of the Legislature, at any regular session, or at any special or extra-ordinary session thereof called for such purpose either in the governor's original call or any amendment thereof, may propose the revision or amendment of any portion or portions of this Constitution. Any such revision or amendment may relate to one subject or any number of subjects, but no amendment shall consist of more than one revised article of the Constitution.

If the proposed revision or amendment is agreed to by three-fifths of the members elected to each house, it shall be entered upon their respective journals with the yeas and nays and published in one newspaper in each county where a newspaper is published for two ·times, one publication to be made not earlier than ten weeks and the other not later than six weeks, immediately preceding the election at which the same is to be voted upon, and thereupon submitted to the electors of the State for approval or rejection at the next general election, provided, however, that such revision or amendment may be submitted for approval or rejection in a special election under the conditions described in and in the manner provided by Section 3 of Article XVII of this Constitution. If a majority of the electors voting upon the amendment adopt such amendment the same shall become a part of this Constitution.

Section 2. *Method of revising constitution.*—If at any time the Legislature, by a vote of two-thirds of all the members of both Houses, shall determine that a revision of this Constitution is necessary, such determination shall be entered upon their respective Journals, with the yea's and nay's thereon. Notice of said action shall be published weekly in one newspaper in every county in which a newspaper is published, for three months preceding the next general election of Representatives,

and in those counties where no newspaper is published, notice shall be given by posting at the several polling precincts in such counties for six weeks next preceding said election. The electors at said election may vote for or against the revision in question. If a majority of the electors so voting be in favor of revision, the Legislature chosen at such election shall provide by law for a Convention to revise the Constitution, said Convention to be held within six months after the passage of such law. The Convention shall consist of a number equal to the membership of the House of Representatives, and shall be apportioned among the several counties in the same manner as members of said House.

Two methods are thus provided for the submission to the people of proposed changes in the constitution. An amendment may be proposed by the legislature. A revision must be proposed by a convention authorized by the people and provided for by the legislature. In its original form section 1, article XVII, limited the scope of amendments by the following language—"The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately." By a change, approved by the people at the election of 1948, the scope of the permissible extent of amendments was broadened so that an amendment "may relate to one subject or any number of subjects, but no amendment shall consist of more than one revised article of the constitution." This language must be given a reasonable construction so as to effectuate the intent of the people in adopting the change made in 1948 and at the same time preserve the principle that a revision of more than a single article of the constitution to be voted upon as a single proposition must be drafted by a convention previously authorized by a vote of the people. The present constitution consists of some twenty articles, each of which, for the most part, relates to either a single general subject or closely related subjects. It was obviously the purpose of the legislature in proposing, and the people in adopting, the amendment of 1948, to authorize the legislature to propose revisions of articles of the constitution while preserving the requirement that more extensive revisions if to be submitted as a single proposition be proposed by conventions.

In revising an article of the constitution, in order to meet changing needs of the people there may be an incidental or implied repeal of or limitation upon the application of some part of some other article of the constitution. See Advisory Opinion to the Governor (Fla.), 12 So. 2d 876. But a general revision of the constitution to be voted upon as a single proposition may not be accomplished indirectly by embracing in a proposed revision of a single article matters only incidentally connected with the subject of the article being revised and which are presently the subject of other articles of the constitution. See City of Coral Gables v. Gray (Fla.), 19 So. 2d 318.

The question here presented is whether or not Senate Joint Resolution No. 1046, which is in the form of an amendment to a single section of article VIII of the constitution, in effect is of broader scope than a revision of one article of the constitution.

In considering this problem it must be constantly borne in mind that we are dealing with a proposed amendment to the constitution which, if adopted, will become a part of the paramount law of the land; that any conflicts between the amendment and pre-existing constitutional provisions must be resolved by giving full effect to the amendment as the latest expression of the popular will. Wilson v. Crews (Fla.), 34 So. 2d 114. If it is adopted the courts and the legislature will be powerless to restrict the meaning of the language used in the amendment. It is not the function, nor is it within the power of the court, to pass judgment upon the wisdom of a proposed change in the constitution. It is within the power, and therefore in proper cases it is the duty, of the court to determine whether or not a suggested change in the constitution has been proposed by the legislature in accordance with the requirements of section 1 of article XVII of the Constitution. Gray v. Childs (Fla.), 156 So. 274; Crawford v. Gilchrist (Fla.), 59 So. 963. In performing this duty the court must examine the contents of the proposed amendment to determine whether or not it consists of more than a revision of one article of the existing constitution. If it does, the legislature was without authority to propose it as an amendment to the constitution and the court should so declare.

An examination of Senate Joint Resolution No. 1046 discloses that the Dade County charter—"may grant full power and authority to the board of county commissioners of Dade County to pass ordinances relating to the affairs, property and government of Dade County and provide suitable penalties for the violation thereof; * * *" If this grant of legislative power be written into the constitution it will be of equal dignity with, and in case of conflict will control over, the general grant of legislative power to the Senate and House of Representatives conferred by section 1, article III, of the constitution. It clearly contemplates that provision may be made by ordinance for the defining and punishment of those offenses usually regulated by municipal ordinances. But there is nothing that limits the fields of law, particularly of criminal law, that may be covered. If, under this constitutional grant of power the county commissioners could adopt an ordinance imposing a fine of $10 for "running" a red light or public profanity, they could under the same grant of power pass an ordinance defining and providing a "suitable" penalty for murder, arson or larceny. Noth-

ing in the proposed amendment limits the powers conferred by the language quoted. If the governmental authority being dealt with were a municipality in the ordinary acceptance of that term the court might be justified in holding that the powers conferred were limited to those usually exercised by municipalities. But the governmental unit being created is something new, and the avowed purpose of the amendment is to depart from heretofore accepted concepts of the relative spheres of state, county, and municipal authority. Its declared purpose is to confer "home rule" upon Dade County. It makes a part of that "home rule" the authority to pass ordinances and define and punish offenses without limitation so long as the punishment provided is "suitable" to the offense.

That this power is intended to go beyond the scope of ordinary municipal legislative power is emphasized by the provision that the charter—"may create new courts and judges and clerks thereof with jurisdiction to try all offenses against ordinances passed by the board of county commissioners of Dade County and none of the other courts provided for by this constitution or by general law shall have original jurisdiction to try such offenses, although the charter *may* confer appellate jurisdiction on such courts, * * *" This could only mean that the power to pass ordinances and provide penalties is to be accompanied by the power to set up and control the judicial processes by which those ordinances, whatever their nature, are to be construed and enforced and offenders punished. From the language used it could even be argued that with respect to decisions of those courts appellate jurisdiction of constitutional courts would depend upon the Dade County charter conferring such jurisdiction.

The fact that in drafting the proposed amendment it was deemed necessary, in order to accomplish its purpose, to provide that the courts created by the Dade County charter, rather than the constitutional courts presently functioning, would have jurisdiction to try offenses against the ordinances, clearly indicates that it is contemplated that the ordinances to be enacted by the county commissioners would cover cases that would, but for the contrary provisions in the amendment, come within the jurisdiction of those courts.

The proposed amendment, therefore, goes beyond the scope of article VIII of the constitution, which relates to "Counties and Cities," and revises section 1, article III, by placing in the board of county commissioners of Dade County a substantial part of the sovereign power of legislation heretofore lodged exclusively in the legislature. And the power of legislation so conferred upon the

board of county commissioners relates to the defining and punishment of crimes, matters primarily of state rather than county or municipal concern.

The proposed amendment would also revise article V of the constitution relating to the courts by vesting a very substantial part of the judicial powers of the state in courts other than those created or authorized by the present constitution. This also is a matter primarily of state rather than county or municipal concern.

Turning to another part of the proposed amendment we find that the charter of Dade County—"May provide a method for establishing * * * special taxing districts, and other governmental units in Dade County * * * and provide for their government and prescribe their jurisdiction and powers." The creation of special taxing districts, the granting to them of the power of taxation, the determination of what taxes, in what amounts, and for what purposes, may be levied and collected by such districts is peculiarly a legislative function. The proposed amendment authorizes the exercise of this power by some "method" to be "provided" in the charter. Again we find an invasion of the sovereign power of legislation which is presently vested in the Senate and House of Representatives, with respect to matters that are primarily of state rather than county or municipal concern. Special taxing districts for harbor improvement, drainage, and school purposes are matters of great local importance, but they are also matters of vital concern to the state as a whole.

The vesting of the power to create special taxing districts and to provide for their government and prescribe their powers and duties in any authority other than the legislature is a revision of section 3 of article IX of the present constitution which declares that—"No tax shall be levied except in pursuance of law." The power of taxation is one of the attributes of sovereignty and can be exercised only pursuant to a valid statute under our present constitution. Kathleen Citrus Land Co. v. City of Lakeland (Fla.), 169 So. 356. The power of taxation cannot be delegated and may be exercised through subordinate agencies of government only within definite limitations fixed by the legislature. Stewart v. Daytona and New Smyrna Inlet District (Fla.), 114 So. 545. But under the proposed amendment there is no limit to the number, area or purpose of the special taxing districts that may be provided for or the number, nature or extent of the taxes which may be imposed by such districts except such as may be found in the due process and equal protection clauses of the federal constitution.

The constitution, as now framed, requires that—"The Legislature shall establish a State Board of Health and also County Boards of Health in all counties where it may be necessary." Section 1, article XV. "The County Boards of Health shall have such powers and be under the supervision of the State Board to such extent as the Legislature may prescribe." Section 3, Article XV. But the proposed charter for Dade County—"May * * * abolish and may provide a method for * * * abolishing * * * all * * * boards or other governmental units whose jurisdiction lies wholly within Dade County, whether such governmental units are created by the Constitution or the Legislature or otherwise, * * *" The duty of the legislature to establish a county board of health in Dade County if it deems one to be necessary is rendered inoperative and a large part of article XV of the constitution is abrogated insofar as Dade County is concerned.

The present constitution contemplates the existence of a special tax school district, or districts, in Dade County. Section 10, article XII. The power to abolish such districts is granted by the proposed amendment. Of course, the amendment authorizes the establishment of some other type of school taxing district without limitation as to the amount or kinds of taxes which may be levied. But the constitutional district and its powers and method of government may be abolished, and the uniformity of the state school system disrupted.

The proposed charter of Dade County—"Shall * * * fix the number, terms and compensation of the [county] commissioners, and their method of election." This is a modification of section 6, article VI, of the present constitution which requires that—"In all elections * * * by the people, the vote shall be by ballot." At first glance this statement does not appear to be justified, but a few moments' study will demonstrate its correctness. Of course, the charter *may* provide for the election of county commissioners for Dade County by ballot, but that process would no longer be required by the constitution. Assuming the incorporation of the proposed amendment into the constitution, it would have to be considered in pari materia with the present quoted provision. Reading the two together, the constitution would provide that—"in all elections by the people, the vote shall be by ballot [except that] the charter [of Dade County] shall * * * fix [the] method of election [of county commissioners of Dade County]." If this were the constitution, could the courts declare invalid a charter provision requiring that county commissioners be elected by viva voce vote at mass meetings of the citizens? A grant of power in the constitution must be judged

by what might be done under it rather than what it is presently contemplated will be done.

Article II of the constitution provides that—"The powers of the government of the State of Florida, shall be divided into three departments; Legislative, Executive and Judicial; and no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this Constitution." Under the proposed charter this principle is departed from by the vesting of broad legislative and executive powers in the board of county commissioners of Dade County. There would, perhaps, be no literal modification of article II by the amendment because, if the amendment be adopted the constitution would expressly authorize the combination of executive and legislative powers in one body of men, and the phrase "except in cases expressly provided for by this Constitution" could be regarded as ambulatory. But there is clearly an abandonment with respect to a large part of the powers of government with respect to a large part of the people of the state of a principle that has heretofore been considered one of the greatest safeguards of human liberty.

For the reasons stated this court can reach no other conclusion but that the proposed amendment is more than a revision of a single article of the constitution and, therefore, could not validly be proposed by the legislature.

It is urged, however, that the real purpose of the proposal is merely to consolidate county and municipal functions in Dade County, to eliminate duplications in governmental activities and produce a more efficient administration of local affairs. This has been done with respect to county and municipal government in several states and if that were all that the proposed amendment did there would be no valid constitutional objections to the method by which it was proposed. But no such narrow or limited construction can be placed upon the proposed amendment. The degree of autonomy which could be, and which apparently it is contemplated will be, assumed by Dade County under the proposed amendment is a complete departure from the entire concept of government which permeates the present constitution of Florida. That the people have the right to set up that kind of government cannot be denied. But it cannot be done by a method of amendment to the constitution which limits the scope of a single amendment proposed by the legislature to the revision of a single article of the present constitution.

What has been said contemplates giving full force and effect to subsection (a) of the proposed amendment from which all of the foregoing quotations were taken. It is urged, however, that subsections (e), (f) and (i) are limitations upon the breadth of subsection (a) and that the proposed amendment as a whole may be given a construction which renders it a proper amendment to be proposed by the legislature.

This argument brings up a situation that is apparently unique in the history of constitutional government. Due in large part, if not entirely, to amendments which were adopted during the legislative consideration of Senate Joint Resolution No. 1046, the proposed amendment consists of separate subsections each of which is clear and unambiguous in its terms but which are so irreconcilably in conflict with each other that legal effect cannot be given one without disregarding the express requirements of others. And this is true with regard to the major parts of the proposed changes in the fundamental law.

A few illustrations will demonstrate the gravity of the problem. It is required that the proposed county charter for Dade County— "(a) (vii) Shall provide a method by which each municipal corporation in Dade County shall have the power to make, amend or repeal its own charter."

The court judicially knows that there are some 26 municipal corporations in Dade County. A constitutional guaranty that the Dade County charter shall respect the autonomy of each of these cities and towns with respect to their charter powers and municipal jurisdictions is unavoidably inherent in the requirement that the charter of Dade County shall provide a method by which each municipality shall have the power to make, amend or repeal its own charter. A municipal charter is nothing more nor less than a formal written declaration of the powers and functions of the municipality and the method by which and the territory within which those powers and functions shall be exercised. The quoted language is so clear that its meaning cannot be made more understandable by any amount of discussion or elaboration. Read alone paragraph (vii) can convey to the reader, whether he be an average voter or the most skilled attorney, but one meaning and that meaning is unmistakable.

But, the proposed amendment also says that the county charter— "(a) (iv) May provide a method by which any and all of the functions or powers of any municipal corporation or other governmental unit in Dade County may be transferred to the board of county commissioners of Dade County."

This language is equally clear. Its meaning is equally unmistakable. Yet it means the exact opposite of paragraph (vii).

Power in the Metropolitan Charter Board and the electors of Dade County to transfer the functions and powers of each of 26 municipalities to the county commissioners cannot co-exist with the right of each of these 26 municipalities to make, amend or repeal its own charter.

The proposed amendment also says that the county charter— "(a) (iii) May change the boundaries of, merge, consolidate, and abolish and may provide a method for * * * abolishing from time to time all municipal corporations. * * * ."

A constitutional grant of power to the electors of the *county* to abolish a municipality, or to transfer any and all of its functions or powers to the county commissioners is not made consistent with a reservation of the power of such municipality to fix its own charter powers and municipal functions merely because the electors of the county may not exercise the power. The *power* granted to the electors of the county is inconsistent with the *rights* reserved to the municipalities.

The argument is advanced that it is intended that the positive provisions of paragraph (vii) will be satisfied by construing it to mean that those municipalities which are not abolished by the county charter (or in a method provided in the county charter), and which are not merged or consolidated with some other municipality by the county charter (or by the method provided in the county charter), may make or amend their own charter with respect to those powers and functions (but only those powers and functions) not transferred to the county commissioners pursuant to paragraph (iv) of the proposed amendment. Such a construction would completely emasculate the specific language which requires that the county charter *"shall* provide a method by which *each* municipal corporation in Dade County shall have the power to make, amend or repeal *its own charter."*

The first sentence of the proposed amendment is as follows— "The electors of Dade County, Florida, are granted power to adopt, revise and amend from time to time a home rule charter of government for Dade County, Florida, under which the board of county commissioners of Dade County shall be the governing body."

This is followed by an enumeration of the powers of local self government which shall or may be provided for in the proposed county charter. These include the fixing of the terms of office and

the method of election of public officials who perform important state functions, the abolition of constitutional and statutory offices, the creation of new offices, the enactment of ordinances for the government of Dade County, the establishment and fixing of the jurisdiction of courts, the creation and fixing of the powers of special taxing districts, the creation, consolidation and abolition of municipalities, and many others. The scheme of government contemplated for Dade County, if subsection (a) of the proposed amendment is given the obvious meaning of the language used, is quite different from the system now in effect under the constitution as it now exists.

But the proposed amendment contains three subsections designated as (e), (f) and (i) which purport, in varying degrees, to retain legislative control over local affairs in Dade County. Because it is the broadest, only subsection (f) will be discussed here. It reads as follows:—"(f) Nothing in this section shall be construed to limit or restrict the power of the legislature to enact general laws which shall relate to Dade County and any other one or more counties of the state of Florida or to any municipality in Dade County and any other one or more municipalities of the state of Florida relating to county or municipal affairs and all such general laws shall apply to Dade County and to all municipalities therein to the same extent as if this section had not been adopted and such general laws shall supersede any part or portion of the home rule charter provided for herein in conflict therewith and shall supersede any provision of any ordinance enacted pursuant to said charter and in conflict therewith, and shall supersede any provision of any charter of any municipality in Dade County in conflict therewith."

If effect be given to paragraph (f) the entire scheme of the plan for "home rule" in Dade County is destroyed, because we have presently a comprehensive statutory coverage of county and municipal government including the number, method of election, and the powers and duties of officers, particularly county commissioners, in conflict with the mandatory and permissive provisions of the proposed Dade County charter. If the general law is to control over the county charter, any provision in the charter conflicting with the general law is superseded by the general law under the requirements of subsection (f) of the proposed amendment and the obvious intent and purpose of subsection (a) of the proposed amendment can never be accomplished.

But, it is argued that the intent of the amendment is to permit the charter to supersede presently existing general laws while re-

taining in the legislature the power to enact laws in the future which will, to the extent of any conflict, supersede the charter. If this argument be accepted we are still confronted with a fundamental and basic conflict.

Subsection (a) of the proposed amendment grants to the electors of Dade County the power to adopt a home rule charter with the express right by such charter to abolish governmental units and officers created by the constitution. This the legislature may not do. Could the legislature by general law revitalize the pre-existing constitution in this respect so that the legislative act would be controlling when the constitution itself would not? There is a basic conflict between the concept of home rule as delineated in subsection (a) of the proposed amendment and the concept of continued legislative authority over the local government of Dade County as expressed in subsection (f). This is emphasized by the grant of power in one breath authorizing the county commissioners to "do everything necessary to carry on a central metropolitan government in Dade County" (subsection (a) (ii)) and the reservation in the next breath of "the power of the legislature to enact general laws which shall relate to Dade County * * * [which] * * * shall supersede any part or portion of the home rule charter * * * in conflict therewith."

The power granted by subsection (a) to the electors of Dade County to adopt a home rule charter of the nature outlined therein cannot co-exist with the power of the legislature expressed in subsection (f). One must yield to the other. If subsection (a) is paramount, subsection (f) must be ignored. If subsection (f) is controlling, the obvious purpose and intent of subsection (a) is destroyed.

Only one other conflict need be mentioned, although others appear from a close scrutiny of the proposed amendment. Subsection (a) (vii) requires that the county charter—"Shall provide a method by which each municipal corporation in Dade County shall have the power to make, amend or repeal its own charter. Upon adoption of this home rule charter by the electors this method shall be exclusive and the legislature shall have no power to amend or repeal the charter of any municipal corporation in Dade County."

Subsection (f) provides—"Nothing in this section shall be construed to limit or restrict the power of the legislature to enact general laws which shall relate to * * * any municipality in Dade County and any other one or more municipalities of the state of Florida relating to * * * municipal affairs and all such general

laws shall apply to Dade County and to all municipalities therein to the same extent as if this section had not been adopted and such general laws shall supersede any part or portion of the home rule charter provided for herein in conflict therewith * * *."

Which is controlling? Is legislative authority over the municipalities of Dade County withdrawn as expressly stated in subsection (a) (vii)? Or is it retained subject only to the requirement that it be exercised by general law as is specified in subsection (f)?

Is the method of change in municipal powers *by the municipality* under subsection (a) (vii) to be *exclusive* as therein *required?* Or may such municipal powers be transferred to the county commissioners by "a method" established under subsection (a) (iv)? If we attempt to construe these two subsections together and say that the method by which municipal functions and powers are to be transferred to the county commissioners must contain a requirement that the municipality consent to the transfer we are still confronted with subsection (a) (iii) which provides that the *same charter* that *must* preserve the powers of municipalities under subsection (a) (vii) *may* abolish all municipal corporations in Dade County. If the charter is adopted by the electors of Dade County and abolishes the municipalities, then the municipalities cannot act to consent to their own destruction.

Having reached the conclusion that the major provisions of Senate Joint Resolution No. 1046 are repugnant, inconsistent and in irreconcilable conflict with each other, the question is presented as to what action the court should take in such a situation.

The grant of authority to the legislature to propose amendments to the constitution by necessary implication requires that a proposed amendment be reasonably intelligible to the electors who are called upon to vote for or against its adoption. This does not mean that a proposed amendment may not be vague or, with respect to its application to particular situations, may not be susceptible to more than one construction. Nor does it mean that it must be understood by the illiterate or those having a minimum of education. Nor does it mean that a lengthy amendment must be held invalid because of apparent conflicts in details or its phraseology. It does mean that a proposed amendment taken as a whole must have a reasonably ascertainable and definite meaning.

Otherwise it cannot be said that a change in the fundamental law has been proposed.

The court is also of the opinion that when major parts of a proposed amendment to the constitution are completely contrary

to each other each, in effect, destroys the other and nothing remains. This proposition is apparently without precedent, but any other conclusion would require the courts to choose between the conflicting provisions and give effect to one while ignoring the other. Courts have the power to construe the constitution, including amendments thereto. Under our present constitution the courts may not be given the power to choose between inconsistent proposed changes in the constitution and thus in effect be given the power to amend the organic law.

There is one decision which is worthy of mention in this connection. The Supreme Court of Idaho, in Utter v. Moseley, 16 Idaho 274, 100 P. 1058, 133 Am. St. Rep. 94, 18 Ann. Cas. 723, said—"If, therefore, two amendments are proposed to the same section of the constitution and are regularly submitted to the electors of the state at the same time, and the vote is in favor of both proposed amendments and they are directly in conflict, then both fail."

This language, in this opinion, may have been obiter dictum but the conclusion reached seems to be the only one which may logically be arrived at.

This court is therefore of the opinion that the contents of Senate Joint Resolution No. 1046 are so inconsistent, conflicting and contradictory that it fails to constitute a proposal of an amendment to the constitution within the contemplation of section 1, article XVII, of the constitution.

In support of their position that the proposed amendment is proper, the defendants rely very strongly upon the decision of the Supreme Court of Colorado in Elder v. Sours, 74 Pac. 167, in which the court sustained an amendment to the constitution of that state providing for a consolidation of the city and county government of Denver. That case is entitled to little weight for two reasons. It was a decision by a court composed of only three judges, no two of whom agreed upon a single opinion, and one of whom dissented from the conclusion reached. The constitutional amendment there considered was far less broad in its effect than that before this court. The later case of Parsons v. People, 76 Pac. 672, materially restricts the construction which might otherwise be placed upon the opinion in the Sours case.

It is, thereupon, considered, ordered, adjudged and decreed—

(1) That Senate Joint Resolution No. 1046, adopted at the 1955 regular session of the legislature, both as to form and substance in the particulars and for the reasons set forth above, fails to con-

stitute a valid proposal by the legislature of an amendment to the constitution within the contemplation and requirements of section 1, article XVII, Florida constitution, and hence should not be included on the official ballot at the 1956 general election.

(2)   That the plaintiff, Harold S. Golden, as a citizen and taxpayer of Dade County, is authorized to institute this proceeding and challenge herein the validity of the proposed constitutional amendment and the legal propriety of the defendant, R. A. Gray, as Secretary of State, incurring expenses payable from the public moneys of the state of Florida, in connection with the proposed amendment in relation to the 1956 general election.

(3)   That the defendant R. A. Gray, as Secretary of State, by reason of paragraph (1) above, is without authority to incur expenses payable from the public moneys of the state of Florida, in connection with the proposed amendment in relation to the 1956 general election.

(4)   That the defendant R. A. Gray, as Secretary of State, be and he hereby is permanently enjoined from incurring expenses payable from the public moneys of the state of Florida for any of the following purposes: the printing, preparation, mailing or certifying of the proposed constitutional amendment, or a statement of the substance thereof, to the boards of county commissioners of the several counties of Florida, for inclusion of the proposed amendment on the official ballot at the 1956 general election; the advertising of the proposed amendment in the newspapers of the state of Florida; or for any other purpose required of said defendant by the constitution or statutes of this state in connection with the notice of or submission to the electors of this state of a valid proposed constitutional amendment.